02-10-516-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00516-CR

 

 


 
 
 Sandra Brown
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

 

FROM THE 211th
District Court OF Denton COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

Introduction

 

          In
this case we are asked whether, in the light most favorable to the trial
court’s ruling, the prosecution proved by a preponderance of the evidence that
Appellant Sandra Brown violated the conditions of her deferred-adjudication
community supervision.  One of us thinks, quite reasonably, that the
prosecution did not prove its case; two of us think it did—but just barely.  We
all agree, however, that the trial court had to work to connect the dots.

Procedural
Background

          Appellant
had negotiated a plea bargain agreement for eight years’ deferred adjudication
community supervision in exchange for her pleading guilty to aggravated
assault.  Four years into her term, the State moved to adjudicate, alleging that
she had failed to pay one month’s required community supervision fee and that
she had committed new offenses.  After a contested hearing, the trial court sustained
the latter allegation, finding that she had committed a new offense, and
granted the State’s motion to adjudicate.  That ruling is the subject of this
appeal.

Standard
of Review

          We
review an order revoking community supervision under an abuse of discretion
standard.  Rickels v. State, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006);
Cardona v. State, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984).  In
a revocation proceeding, the State must prove by a preponderance of the
evidence that the defendant violated the terms and conditions of community
supervision.  Cobb v. State, 851 S.W.2d 871, 873 (Tex. Crim. App.
1993).  The trial court is the sole judge of the credibility of the witnesses
and the weight to be given their testimony, and we review the evidence in the
light most favorable to the trial court=s
ruling.  Cardona, 665 S.W.2d at 493; Garrett v. State, 619 S.W.2d
172, 174 (Tex. Crim. App. [Panel Op.] 1981).  If the State fails to meet its
burden of proof, the trial court abuses its discretion by revoking the
community supervision.  Cardona, 665 S.W.2d at 493–94.

Discussion

Community
Supervision Fees

          The
State first argues that there is sufficient evidence in the record for us to
uphold the trial court’s ruling based upon the allegation that Appellant failed
to pay her fee, with the implication being that we could simply modify the trial
court’s judgment to reflect that the trial court sustained on this allegation
rather than on the allegation that she committed a new offense.[2] 
The evidence, however, even beneath the light-most-favorable, does not lead us
to so hold.

          At
the hearing on the State’s motion to adjudicate, Chris Alexander testified that
he supervised a probation officer named Rhett Wallace, that he ensured Wallace
managed his files and probationers, that he was familiar with Appellant’s case,
and that he had reviewed her file.  He testified that a motion to adjudicate
had been filed against Appellant, alleging that she had not paid a supervision
fee for June 2005, that this allegation was the only one with which Alexander’s
department was directly involved, and that “[t]he only technical violation she
has is the one non-payment.”  The State presented no other evidence on the
issue.

          To
prove that a probationer failed to pay a community supervision fee, the State
must show by a preponderance of the evidence that the probationer had the
ability to pay but did not pay as ordered by the trial court.  Article 42.12,
section 21(c) of the code of criminal procedure reads in pertinent part,

In a community
supervision revocation hearing at which it is alleged only that the defendant
violated the conditions of community supervision by failing to pay . . .
community supervision fees . . . the state must prove by a preponderance of the
evidence that the defendant was able to pay and did not pay as ordered by the
judge.[[3]]

 

Tex.
Code Crim. Proc. Ann. art 42.12, § 21(c), as amended by Act of June 15, 2007,
80th Leg., ch. 604, § 1, eff. Sept. 1, 2007; see Sherwood v. State, No. 10-09-00114-CR,
2010 WL 1611063, at *1 (Tex. App.—Waco Apr. 21, 2010, pet. ref’d.) (mem. op.,
not designated for publication) (“Under . . . [art. 42.12, section 21(c) as
currently written,] the State must prove that the defendant had the ability to
pay and did not pay the court-ordered . . . community supervision fees . . . .”);
Hood v. State, No. 12-08-00366-CR, 2009 WL 4981459, at *2 (Tex. App.—Tyler
Dec. 23, 2009, no pet.) (mem. op., not designated for publication) (recognizing
that 2007 amendments to article 42.12, section 21(c) changed “defendant’s
‘ability to pay’ from an affirmative defense to something the state must show”).

          The
State must also prove that the probationer’s failure to pay was intentional.  Stanfield,
718 S.W.2d at 736 (stating that “nonpayment of fees must be intentional”); Fletcher
v. State, 547 S.W.2d 634, 636 (Tex. Crim. App. 1977).

          The
State offered no evidence to show nor did it argue that Appellant was able to
pay her June 2005 fee as ordered by the trial judge or that her failure to pay
was intentional.  Accordingly, the trial court properly did not base its
judgment on a finding that Appellant failed to pay her community supervision
fees, and the record does not support our reforming the judgment to reflect
such a finding.

New
Offense:  Fraudulent Use of Identifying Information

          The
State argues in the alternative that the evidence is sufficient to support the
trial court’s finding that Appellant committed a new offense.  This is where
the trial court had to connect some dots, and in the light most favorable to
the trial court’s ruling, the State’s argument narrowly prevails.

          In
its motion to adjudicate, the State alleged that Appellant committed multiple fraudulent-use-of-identifying-information
offenses.  See Tex. Penal Code Ann. § 32.51, as amended by Act of June
15, 2007, 80th Leg., ch. 631, § 1, eff. Sept. 1, 2007.  Specifically, the
allegations included that

[Appellant]
violated said term and condition in that on or about March 2, 2009, in Johnson
County of the State of Texas, she did then and there [with] intent to defraud
or harm another, and without the consent of Ben Fruin, use identifying
information of Ben Fruin, to-wit:  name and Bank of America checking account
number.

          At
the hearing on the motion to adjudicate, the State called Renae Fruin, who
testified that she and the complainant, her husband Ben Fruin, jointly own her
company’s business checking account.  State’s Exhibit 1 is a collection of bank
records showing transactions made on a Bank of America business economy
checking account with a “check card” ending in “5001.”  Renae identified
State’s Exhibit 1 as printouts of unauthorized transactions made against the
account.

          Appellant
concedes that Renae’s testimony established that someone charged items against
Renae’s and Ben’s account without Renae’s permission, but she asserts
that it did not establish that the charges were made without Ben’s permission.
 Before Renae testified, however, Johnson County Sheriff’s Detective Leona
Yocham testified that Ben reported that “he was having unauthorized uses of his
debit card.”  Moreover, Renae testified as follows:

          Q.      And
did anyone have the permission of the business, yourself, or your husband
to use your account information to make these purchases?

 

          A.      No,
sir.

 

[Emphasis
added.]  Viewed in the light most favorable to the trial court’s ruling, the evidence
in the record established that neither Renae nor Ben authorized the charges.

          We
now turn to the bulk of Appellant’s argument, which is her claim that the
evidence does not tie her to any transactions debited against the Fruins’
account.  As stated above, State’s Exhibit 1 is a collection of documents
showing charges posted to the Fruins’ account that Renae testified were
unauthorized.  Among the many unauthorized charges, is one posted on March 11,
2009, for $132 to “BMC, METRO PCS.”  State’s Exhibit 2 consists of records from
Metro PCS, Inc., showing payment by a Visa card ending in “5001” that was made
on March 10, 2009, at 12:01 a.m. for a account number 214853322000010600 8619521. 
The payment came in by telephone and was made from a telephone with the number
214-853-3220.  State’s Exhibit 2 also includes detailed information pertaining
to that account and phone number.  On April 9, 2008, a cell phone with phone
number (214) 853-3220 was activated and subscribed to by “Sandy Brown,” whose
date of birth is May 11, 1979, and whose address is listed as 143 Evergreen
Circle, Arlington, TX  76011-6210.

          Noting
that this cell phone account “appears to be for a Sandy” but not “Sandra”
Brown, Appellant asserts that no evidence was “ever introduced” that the
account is “connected to Appellant in any manner.”  She is incorrect.  State’s
Exhibit 14 is a record of search results from pawn shop transactions across the
state.  The exhibit shows that on May 31, 2009, “Sandra Le Brown” pawned a
television set at First Cash Pawn No. 08 in Dallas.  In addition to name, driver’s
license number, and physical description, the customer identification
information included date of birth, address, and telephone number.  The Sandra
Brown who pawned a television on that date at that pawn shop gave her address
as “143 Evergreen Circle, Arlington, TX 76011,” her date of birth as “5/11/1979,”
and her telephone number as “214-853-3220.”

Given
evidence that “Sandy Brown” and “Sandra Brown” have identical addresses, dates
of birth, and telephone numbers, the trial court could reasonably conclude that
they are the same person.

          To
summarize the evidence so far:  on or about March 10, 2010, someone used
Appellant’s cell phone to pay Appellant’s cell phone bill by charging Ben
Fruin’s Bank of America checking account without permission.  Appellant’s
remaining contention is that the evidence does not prove that she is that
someone.

          We
would agree with Appellant if the State’s burden of proof had been beyond a
reasonable doubt.  But we think that, when viewed in the light most favorable
to the trial court’s ruling, the evidence supports a reasonable conclusion that
Appellant more likely than not used her own cell phone to pay her own cell
phone bill.  In addition, there is other evidence in the record to support a
reasonable inference that she fraudulently used the Fruins’ account number.

          State’s
Exhibit 1 shows a score of individual transactions charged to the Fruins’ account
in the first half of March 2009.  Renae testified that these transactions were
unauthorized and that their dollar value was in the thousands.  Some of the
higher-value transactions included $592.98, $409.96, and $502.98 paid to
Newegg.com for electronics, including two high-definition televisions and a
computer.  All three of these items were ordered within three days of each
other and were shipped to a “James Fruin” at two different addresses.  The computer
went to the Arlington home of Joyce Woodard; the televisions to an apartment in
Grand Prairie belonging to Stephanie Williams.  James Fruin is a distant
relative of Ben’s, but the two do not speak and have not been in contact for
some time.  Renae testified that she does not know either Woodard or Williams.  On
the other hand, the record shows that Woodard is a “very close friend” of
Appellant’s family, and that the Johnson County Sheriff’s Department made initial
contact with Appellant through information provided by Williams.

          Other
items charged to the Fruins’ account during the same three days were sent to “James
Fruin” at Williams’s apartment, including two men’s rings from Overstock.com at
a cost of $293.76.

          One
or both of these rings was apparently pawned by Appellant’s cousin, Jamall
Brown, who was a frequent customer of pawn shops across the state.[4] 
When Jamall’s pawning travels brought him to Dallas in the early part of 2009,
the record shows that on March 2, his cell phone bill was paid—as Appellant’s was
on March 10—with the Fruins’ account number.

          The
record also indicates that Appellant accompanied her cousin Jamall on two of
his visits to Dallas pawn shops.  When he pawned the men’s fashion rings
purchased with the Fruins’ account number from Overstock.com, the record shows
that three minutes later, she pawned a portable MP3 player for $60 at the same
store.  The record also shows that the next week at this store, Appellant
pawned a ladies’ fashion ring just four minutes before Jamall pawned the other men’s
ring purchased with the Fruins’ account number.[5]  Finally, the record
shows that on March 30, 2009, Jamall pawned a laptop computer at this store,
and the next day, Appellant pawned a television at a different Dallas pawn shop,
First Cash Pawn No. 8.

          Within
the span of a couple of weeks in March 2009, the Fruins’ account was charged
for:

·       
Appellant’s
cell phone bill, which was paid using Appellant’s cell phone;

·       
Appellant’s
cousin’s cell phone bill;

·       
men’s
and women’s jewelry and a number of high-dollar electronics products including
televisions and computers, which were shipped to addresses belonging to
Appellant’s friends in the name of Ben Fruin[6] or a distant relative
with whom Ben had no contact.

Given
Jamall’s history of pawning jewelry and electronics across the state, and given
that Appellant pawned similar items within minutes of his pawning items charged
to the Fruins’ account, we hold that the evidence, viewed in the light most
favorable to the trial court’s ruling, is sufficient to show that it is more
likely than not that Appellant violated the conditions of her community
supervision by fraudulently using Ben Fruin’s account number.  Specifically,
from the direct and circumstantial evidence presented in this case, the trial
court could reasonably have concluded that while participating in a scheme to
fraudulently use Ben Fruin’s account number to purchase items for her own use
or for resale at pawn shops, Appellant also charged her cell phone bill to his
account.  See Cobb, 851 S.W.2d at 873; Cardona, 665 S.W.2d at
493; Garrett, 619 S.W.2d at 174.  Accordingly, we overrule Appellant’s
sole issue.

Conclusion

          Having
overruled Appellant’s sole issue, we affirm the judgment of the trial court.

 

 

LEE GABRIEL

JUSTICE

 

PANEL: 
DAUPHINOT,
GARDNER, and GABRIEL, JJ.

 

DAUPHINOT,
J. filed a concurring and dissenting opinion.

 

PUBLISH

 

DELIVERED:  November 17,
2011




 
 
 
 
 
 


 

 




 

 









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00516-CR

 

 


 
 
 Sandra Brown
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 211th
District Court OF Denton COUNTY

----------

CONCURRING
AND DISSENTING OPINION

----------

I
agree that the State did not prove that Appellant had the ability to pay but
intentionally failed to pay her community supervision fee.  Respectfully, however,
I cannot agree with the majority that the State proved that she committed a new
offense while on community supervision, no matter how hard I stretch to connect
the dots.

The
State alleged that Appellant, on or about March 2, 2009, with “intent to
defraud or harm another, and without the consent of Ben Fruin, [did] use
identifying information of Ben Fruin, to-wit:  name and Bank of America [BOA] checking
account number.”

The
real problems with this case stem from the inability of the State to tie
Appellant to any transactions debited against Ben’s account.  Someone paid
Appellant’s cellular phone bill over the telephone.  There is no indication who
paid the bill or whether the person was male or female.  The evidence shows
only that bank records reflect an online BOA banking transaction showing a
charge that Ben’s wife said was unauthorized.  The Metro PCS records show
payment by a Visa card ending in “5001,” the last four numbers of the Fruins’
check card number.  And, although cell phone records connected to the cell
phone bill show that the phone was activated and subscribed to by “Sandy
Brown,” there is no proof that Appellant used that phone to pay the cell phone
bill; no proof that Appellant knew that the Fruins’ checking account was being
tapped to pay the bill; and no proof that Appellant knew that any unauthorized
charge was made to pay the bill.  There is no evidence that Appellant committed
any act with intent to defraud or harm another or that she used Ben Fruin’s
name or BOA checking account number.  If someone borrows my car and uses a
stolen credit card to buy gasoline for it without my knowledge, am I guilty of
credit card abuse?

The majority manages
to connect the dots in this way:

 

1.           
Someone used Ben Fruin’s Visa card to pay the bill for a cell phone
listed as belonging to Sandy Brown.

 

2.           
Pawn shop records show that Sandra Le Brown pawned a television in
Dallas.

 

3.           
The pawn shop records and cell phone company records show that Sandy
Brown and Sandra Le Brown have the same date of birth, address, and telephone
number.

 

4.           
Therefore, the majority concludes, Appellant is the person who paid the
cell phone bill because:

 

A.          
Other items were purchased and charged to the Fruins’ account and
shipped to Ben Fruin’s distant relative James Fruin, with whom he does not
speak and has had no contact, at two different addresses;

 

B.          
The addresses to which the James Fruin purchases were shipped were that
of Joyce Woodard, “a very close friend” of Appellant’s family, and Stephanie
Williams, who provided information to the Johnson County Sheriff’s Department
that allowed them to contact Appellant;

 

C.          
Appellant’s cousin Jamall Brown often frequented pawn shops and pawned a
ring shipped to James Fruin at Williams’s apartment and charged to the Fruins;

 

D.          
Cousin Jamall’s own cell phone bill was paid out of the Fruins’ account;

 

E.          
Appellant sometimes accompanied Jamall to pawn shops to pawn things. 
She was at the pawn shop when he pawned the ring;

 

F.          
Given Cousin Jamall’s “history of pawning jewelry and electronics across
the state, and given that Appellant pawned similar items within minutes of his
pawning items charged to the Fruins’ account,” Appellant and not Cousin Jamall
or James Fruin used Ben Fruin’s name and bank account number with intent to
harm and defraud someone because she, and no one else, must have paid the cell
phone bill.  Or perhaps Appellant was a party because, with intent to harm and
defraud someone else, she solicited, encouraged, directed, aided, or attempted
to aid Cousin Jamall and James to use Ben Fruin’s name and bank account number.[7]

 

Yet
the record contains no evidence that Jamall or James lacked Ben’s consent to
use the Visa card or to use his name and account number.

The
State was required to prove that Appellant, with intent to harm or defraud
another, and without the consent of Ben Fruin, used his identifying information—specifically,
his name and BOA checking account number.  The State did not prove by a
preponderance of the evidence that Appellant did any of these things.  The only
expenditure connected to Appellant was the payment of her cell phone bill. 
There is no evidence who paid it or that she knew it was paid in any way
connected to Ben Fruin.  Consequently, there is no evidence of her intent to
harm or defraud any person.  There is no evidence that she used Ben Fruin’s
name.  There is no evidence that she used his BOA checking account number.  If
she was found to have acted as a party, there is no evidence that, with intent
to harm and defraud someone else, she solicited, encouraged, directed, aided,
or attempted to aid Cousin Jamall or James to use Ben Fruin’s name or bank
account number.  Further, there is no evidence that either Cousin Jamall or
James did not have consent to use the Visa card or to use Ben Fruin’s name or
bank account number.

I
agree that the State did not prove Appellant’s failure to pay her community
supervision fee.  But I cannot agree that the State succeeded in proving that
Appellant committed the new offense alleged in the petition.  I would therefore
reverse the trial court’s judgment and remand this case.  Because the majority
does not, I must respectfully dissent.

 

 

 

LEE ANN DAUPHINOT
JUSTICE

 

PUBLISH

 

DELIVERED:  November 17,
2011

 









[1]See Tex. R. App. P. 47.4.





[2]Errors in the trial court=s order may be modified on
appeal if the reviewing court has the necessary data and evidence to do so. 
Tex. R. App. P. 43.2(b); Bigley v. State, 865 S.W.2d 26, 27–28 (Tex.
Crim. App. 1993); Maddox v. State, No. 02-08-00020-CR, 2009 WL 213715,
at *3 (Tex. App.—Fort Worth Jan. 29, 2009, no pet.) (mem. op., not designated
for publication).  The judgment in this case does not include a finding that
the failure-to-pay allegation is true.





[3]The legislature’s use of
the word “only” in the statute is not intended to lift the requirement that the
State prove that the probationer was able to pay and did not pay as ordered by
the judge when the State includes additional allegations of nonmonetary community
supervision violations.  See Stanfield v. State, 718 S.W.2d 734, 737
(Tex. Crim. App. 1986) (holding that such a construction “produces quirky
consequences”).





[4]Regarding Jamall’s
statewide pawning activity, the record showed the following:  On October 4,
2008, he pawned a laptop computer with charger at Top Dollar Pawn in Bryan; on October
27, 2008, a car speaker at Gold’N’Dollar Money Mart in Houston; on November 13,
2008, a lady’s fashion ring at EZPawn in Bay City; on November 19, 2008, a gold
chain at EZPawn in Baytown; on November 21, 2008, a digital camera at the
Baytown EZPawn; on December 30, 2008, a laptop computer at Cash America in
Houston; on February 11, 2009, a portable MP3 player at Cash America No. 5 in
Dallas; and at that same Dallas Cash America, a laptop computer on March 30,
2009.





[5]Both of the items Appellant
pawned were similar to items Jamall had pawned in the past.  On November 13,
2008, he had pawned a lady’s fashion ring in Bay City, Texas; and a month
before she pawned an MP3 player at the Cash America in Dallas for $60.00, he
had pawned an MP3 player at that store for $60.00.





[6]State’s Exhibit 3 includes
documentation from Zappos.com showing an order for a Soho document case priced
at $140.22 placed on the evening of March 7, 2009, and shipped to “Ben Fruin”
at Stephanie Williams’s Grand Prairie apartment.  State’s Exhibit 1 shows a
posting to the Fruins’ account number in the amount of $140.22 paid to
Zappos.com on March 9, 2009.





[7]See Tex. Penal Code
Ann. § 7.02(a) (West 2011).